

| STATE OF MICHIGAN<br>~~JUDICIAL DISTRICT~~<br>30th JUDICIAL CIRCUIT<br>~~COUNTY PROBATE~~ | SUMMONS AND COMPLAINT | 04  1050  CASE NO. |
|---|---|---|

Court address
313 W. Kalamazoo, Lansing, MI 48911

Court telephone no.
517-483-6300

| Plaintiff(s)Petitioner(s)<br><br>CHRISTIAN T. REINHARDT, IV | v | Defendant(s)Respondent(s)<br><br>DYNAMIC NETWORK SERVICES, INC., a Delaware corporation doing business in Michigan, DYNAMIC DNS NETWORK SERVICES, LLC, a Delaware limited liability company, TIMOTHY J. WILDE, JEREMY HITCHCOCK and THOMAS DALY |
|---|---|---|
| Plaintiff attorney, bar no., address and telephone no.<br>John C. Schlinker (P43188)<br>Willingham & Coté, P.C.<br>333 Albert Avenue, Suite 500<br>East Lansing, Michigan 48823-4394<br>(517) 351-6200 / FAX (517) 351-1195 | | |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued   JUL 2 3 2004 | This summons expires OCT 2 2 2004 | Court clerk  MIKE BRYANTON |
|---|---|---|

*This summons is invalid unless served on or before its expiration date.

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of Circuit Court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the Circuit Court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

The civil/domestic relations action   ☐ remains   ☐ is no longer pending.

| VENUE | |
|---|---|
| Plaintiff(s) residence(include city, township or village)<br>Ingham County, Michigan | Defendant(s) residence(include city, township or village)<br>Manchester, New Hampshire |
| Place where action arose or business conducted      Michigan | |

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

July 26, 2004
Date

_Signature of attorney_      John C. Schlinker (P43188)

**COMPLAINT IS STATED ON THE ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangements.
MC 01 (11/97) SUMMONS AND COMPLAINT      MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

## STATE OF MICHIGAN
### IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM

CHRISTIAN T. REINHARDT, IV,

      Plaintiff,

v

DYNAMIC NETWORK SERVICES,
INC., a Delaware corporation doing
business in Michigan, DYNAMIC DNS
NETWORK SERVICES, LLC, a
Delaware limited liability company,
TIMOTHY J. WILDE, JEREMY
HITCHCOCK and THOMAS DALY,

      Defendants.

File No. 04- \O5O-C2

**PAULA J.M. MANDERFIELD**

---

John C. Schlinker (P43188)
Lee B. Reimann (P51895)
Willingham & Coté, P.C.
Attorneys for Plaintiff
333 Albert Avenue, Suite 500
East Lansing, Michigan 48823-4394
517-351-6200 / FAX 517-351-1195

---

### VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTION, TEMPORARY RESTRAINING ORDER, INJUNCTIVE AND OTHER RELIEF

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint. MCR 2.113(C)(2)(a).

Plaintiff, Christian T. Reinhardt, IV, by his attorneys, Willingham & Cote, P.C., states

for his Verified Complaint against Defendants:

### GENERAL ALLEGATIONS

1.    Plaintiff is a resident of Ingham County, Michigan.

2.    Dynamic Network Services, Inc. (DNS, Inc.) is a Delaware corporation conducting business in Michigan. DNS, Inc. is an internet computer business using a Custom DNS system that converts names to internet protocol addresses. DNS, Inc. owns computer servers that are housed in Southfield, Michigan and 25% of DNS, Inc.'s workforce (2 of 8) is permanently located in Michigan.

3.    Plaintiff, and Plaintiff alone, invented the Custom DNS system upon which DNS, Inc. was built and plaintiff maintains exclusive ownership to the Custom DNS system.

4.    Defendant Dynamic DNS Network Services, LLC (DNS, LLC) is a Delaware limited liability corporation that is a wholly owned subsidiary of DNS, Inc.

5.    Defendants Timothy J. Wilde, Jeremy Hitchcock and Thomas Daly, upon information and belief, are all residents of New Hampshire and officers and directors of DNS, Inc and all regularly transact business in Michigan.

**JURISDICTION**

6.    General personal jurisdiction is properly exercised over DNS, Inc. and DNS, LLC because both corporations carry on a continuous and systematic part of its general business within the state of Michigan. MCL 600.711(3).

7.    Limited personal jurisdiction is properly exercised by this Court over Timothy J. Wilde, Jeremy Hitchcock and Thomas Daly because each of them transacts business in Michigan and upon information and belief, each has been physically present in Michigan while conducting business. MCL 600.705(1)

8.    This Court has original jurisdiction to hear and determine this civil claim and demand for remedies. MCL 600.605.

2

## VENUE

9. Venue is proper in Ingham County because DNS, Inc. conducts business in Ingham County (MCL 600.1621(a)) and Plaintiff resides in Ingham County. MCL 600.1621(b).

## COUNT I
## BREACH OF STOCKHOLDER'S AGREEMENT

10. Plaintiff owns 36% of the stock of DNS, Inc. As alleged above, it was Plaintiff, and Plaintiff alone, that created the Custom DNS program that allowed DNS, Inc. to thrive in the internet business world. Plaintiff invented the Custom DNS in or about spring 2001 in 315 Abbott while a student at Michigan State University.

11. Dotster, Inc. is an internet domain name service company. Dotster, Inc. recently offered to purchase DNS, Inc. for $25,000,000. Upon information and belief, Dotster, Inc. and DNS, Inc. are in the process of conducting due diligence prior to closing the sale of DNS, Inc. to Dotster, Inc.

12. On July 23, 2004, plaintiff received a letter from DNS, Inc. purporting to terminate his employment with DNS, Inc. for "cause", despite the fact that no cause was stated. (Exhibit 1,Termination Letter)

13. Termination for cause becomes a triggering event under the Stockholders' Agreement requiring Plaintiff to sell his stock to DNS, Inc. (Exhibit 2, Stockholders' Agreement, page 2)

14. Plaintiff has an Employment Agreement that automatically renews every year on July 31 unless notice of non-renewal is given within 30 days of July 31. In other words,

3

Plaintiff's Employment Agreement just renewed on July 1, 2004 and Defendants clearly had no cause to terminate the Employment Agreement just three weeks ago. (Exhibit 3, Employment Agreement.

15.   DNS, Inc.'s attempt to terminate Plaintiff for cause is merely a pretext to allow DNS, Inc. and its shareholders to wrongfully acquire Plaintiff's share of the proceeds from the sale of DNS, Inc. and attempt to wrongfully acquire Plaintiff's ownership interest in the Custom DNS program.

16.   DNS, Inc. has threatened to "cause the sale of" Plaintiff's stock within 72 hours of the July 23, 2004 termination letter. (Exhibit 3, page 2). Plaintiff must obtain injunctive relief today (July 26) or Plaintiff will suffer irreparable harm.

WHEREFORE, Plaintiff asks this Court for a Temporary Restraining Order and a Preliminary Injunction prohibiting the sale or transfer of Plaintiff's stock in DNS, Inc. and further prohibiting the termination of Plaintiff's employment pending a full hearing on the merits. Plaintiff also asks for costs and fees wrongly incurred in defense of Defendants' actions.

Respectfully Submitted
Willingham & Cote', P.C.
Counsel for Plaintiff

Dated: July 26, 2004

By: _____
John Schlinker (P431188)
Lee B. Reimann (P51895)
333 Albert, Ste. 500
East Lansing, MI 48823
517-351-6200/FAX 517-351-1195

4

**VERIFICATION**

CHRISTIAN T. REINHARDT, IV

STATE OF MICHIGAN )
                   )ss:
COUNTY OF INGHAM )

    On the 26th day of July, 2004, before me personally appeared Christian T. Reinhardt, and made oath that he has read the foregoing instrument by himself subscribed and knows the contents thereof, that the same is true of his knowledge, except as to those matters therein stated to be upon information and belief and, as to those matters, he believes them to be true.

REBECCA L. GRENAWALT
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires July 12, 2007
Acting in the County of Ingham

Rebecca Grenawalt, Notary Public
Ingham County, Michigan
My Commission Expires: 7-12-2007
Acting in the County of: Ingham

H:\Team_A\Schlinker\Reinhardt Verified Comp.wpd

5

DynDNS.org

July 23, 2004

Chris Reinhardt
1830 East Shore Drive. Apt D2
East Lansing, MI 48823

Dear Chris:

After careful consideration, we have determined to terminate your employment with Dynamic Network Services, Inc. ("DNS" or the "Company"). This letter shall serve as notification of that termination, which is effective immediately. Your final paycheck was deposited into your account today. All access to DNS systems and properties has been revoked.

Your employment agreement with DNS provides that you may be terminated "for cause" pursuant to Paragraph 10 of the Employment Agreement or "other than for cause" pursuant to Paragraph 11 of the Employment Agreement. We have decided to terminate you "for cause" effective immediately, but we will agree to terminate you "other than for cause" if you accept our offer below. A termination for cause (or your resignation) becomes a "triggering event" in the Stockholders' Agreement signed by each of us. In this case, DNS would repurchase your stock based on a previously agreed upon $200,000 valuation of DNS. The value of your 36% ownership of DNS would be $72,000. DNS would be required to pay 10% (or, $7,200) at the time of the sale. The balance is required to be paid in quarterly installments over 7 years, at a current interest rate of 5.25%. These payments at the current rate would equal $2,780.51 per calendar quarter. No severance payment or other payment is required.

In lieu of a termination for cause and the requirement that we work within our Stockholders' Agreement, we offer a far more generous package. We would terminate you "other than for cause" and offer you a three year severance at your current salary of $90,000, for a total of $270,000 in severance pay, payable in equal biweekly installments made at the same time as payroll payments are made. The payment of this severance, and the termination of your employment other than for cause, is conditioned on your agreement to sell your stock back to DNS for a total nominal price of $100 and your execution and return of the attached Agreement and Release and the Stock Repurchase Agreement. The Agreement and Release also provides for your immediate resignation from the Board.

Regardless of your decision with respect to our offer, any company equipment that you may have is not required to be returned, with the exception of your NBX phone. Your American Express cards and your Citizens Bank card are now inactive. We do request that you also return your facility access badge(s) to us. Those items can be shipped to us at:

Dynamic Network Services, Inc.
1 Sundial Ave. Suite 301
Manchester, NH 03103

DynDNS.org

Your group health insurance will remain active until August 31st, 2004; your group dental insurance will remain active until July 31st, 2004

As a reminder, you remain bound by the non-disclosure and non-compete agreements as stated within the employment agreement. These terms survive the termination of your employment.

Please let us know whether you will accept our offer. We are willing to discuss other alternatives outside of the Stockholders' Agreement by phone. We request a decision on this matter within 72 hours, with a closing on the stock repurchase and executed documents returned to Jeremy Hitchcock no later than August 6, 2004. If we do not hear from you within 72 hours, then we will presume that we will complete the termination "for cause" and cause the sale of the stock within the scope of the Stockholders' Agreement.

Sincerely,

Timothy J. Wilde, President,
Director, Stockholder

Jeremy P. Hitchcock, CFO,
Director, Stockholder

Thomas J. Daly, CIO,
Director, Stockholder

# DYNAMIC NETWORK SERVICES, INC.

## STOCKHOLDERS' AGREEMENT

This Stockholders' Agreement (the "Agreement"), made as of July 3½, 2003, is by and among **DYNAMIC NETWORK SERVICES, INC.**, a Delaware corporation with its principal place of business at 210 Park Avenue, #267, Worcester, Massachusetts 01609 (the "Corporation"), Timothy J. Wilde, Christian T. Reinhardt IV, Jeremy Hitchcock, and Thomas Daly and any other persons whose names may appear on Schedule I in accordance with the terms of this Agreement (each a "Stockholder" and collectively the "Stockholders"), and is to the following effect:

WHEREAS, the Corporation presently has an authorized capital stock which consists of one thousand (1,000) shares of common stock, $.01 par value, of which one hundred (100) shares are issued and outstanding on the date hereof and are owned by the Stockholders as follows:

| | |
|---|---|
| Timothy J Wilde | 36 |
| Christian T. Reinhardt IV | 36 |
| Jeremy Hitchcock | 14 |
| Thomas Daly | 14 |

WHEREAS, it is in the mutual best interest of the parties to this Agreement to provide for continuity and harmony in the management, ownership and policies of the Corporation; and

WHEREAS, it is the mutual intent of the parties to restrict the transfer of the Corporation's common stock, and to provide for certain rights by, and requirements of, the Corporation and the other Stockholders to purchase the shares of the Corporation's common stock owned by the Stockholders upon the occurrence of a Triggering Event, as hereinafter defined.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

## ARTICLE I

## DEFINITION OF STOCK

All shares of common stock of the Corporation now or hereafter acquired (by purchase, gift, stock dividend, stock split or otherwise) by a Stockholder shall be subject to this Agreement (hereinafter, the "Stock").

{J:\CLIENTS\bus\302852\0002\00367167.DOC;2}

## ARTICLE II

## DEFINITION OF TRANSFER

Any sale, transfer, pledge, assignment or other disposition or encumbrance whether voluntary, involuntary or by operation of law of any share of or interest in the Stock (hereinafter, a "Transfer") shall be restricted as hereinafter set forth, and no shares of the Stock shall be sold or transferred on the books of the Corporation until compliance with the provisions of this Agreement. Any Transfer contrary to the provisions of this Agreement shall be null, void and of no effect.

Notwithstanding the above, the pledging of Stock where there is neither a transfer of the legal title thereto nor a transfer on the books of the Corporation into the name of the pledgee, shall not be deemed to be a Transfer, but in such case no pledgee or person claiming thereunder shall be entitled to make or cause to be made any transfer of pledged Stock by sale thereof or otherwise (including in this prohibition transfer on the books of the Corporation into the name of the pledgee) and any such pledge shall be subject to these conditions and restrictions.

## ARTICLE III

## DEFINITION OF TRIGGERING EVENTS

The following shall be known as "Triggering Events" as to a Stockholder:

(a)     a Transfer or attempted Transfer of any or all of a Stockholder's Stock, or the intent of a Stockholder to make a Transfer of any or all of his or her Stock during his or her lifetime;

(b)     a Stockholder's death;

(c)     a resignation by, or termination for cause of, the Stockholder from his employment with the Corporation or any subsidiary of the Corporation;

(d)     a Stockholder's filing of a voluntary petition under any bankruptcy or insolvency law, or a Stockholder's becoming subject to an involuntary petition under any bankruptcy or insolvency law, provided said petition has not been dismissed or otherwise dissolved within sixty (60) days;

(e)     a Stockholder's petition for the appointment of a receiver or assignment of his or her shares of Stock for the benefit of creditors, or a Stockholder involuntarily becoming subject to such a petition or assignment, provided said

{J:\CLIENTS\bus\30285Z0002\00367167.DOC;2}          - 2 -

petition or assignment has not been dismissed or otherwise dissolved within thirty (30) days.

## ARTICLE IV

## PURCHASE TERMS FOR OTHER THAN STOCKHOLDER'S DEATH

A.    Election by Corporation to Purchase Other Than Stockholder's Death; Rescission of Election.  Within thirty (30) days of the occurrence of any one or more of the Triggering Events, other than a Stockholder's death, the affected Stockholder (hereinafter the "Divesting Stockholder"), shall notify the Corporation of the occurrence of the Triggering Event. The Corporation shall have the right to purchase all or a portion of the Stock owned by the Divesting Stockholder as of the date of the Triggering Event, for the Purchase Price determined pursuant to Article VII of this Agreement. If the Corporation elects to exercise its right to purchase, it must first send an electing notice in writing to the Divesting Stockholder within the fifteen (15) day period immediately following the Corporation's receipt of notice of the Triggering Event. The Corporation's electing notice shall state the Corporation's election to purchase the Divesting Stockholder's Stock, or a portion thereof, at the Purchase Price previously determined pursuant to the terms of this Agreement, or, if no such determination was made, contingent upon its satisfaction with the Purchase Price. If the Purchase Price is not previously determined, the Divesting Stockholder and the Corporation shall then take all actions necessary to determine the Purchase Price in accordance with Article VII of this Agreement. The Corporation shall have an additional fifteen (15) day period after the later of the date of the initial notice, if the Purchase Price has been previously determined, or the date in which the Purchase Price is so determined, if the Purchase Price had not been previously determined, to rescind its election and to so notify the Divesting Stockholder and the Other Stockholders (as defined below) in writing. It is agreed that the decision whether the Corporation will elect to purchase Stock under this Article IV will be made by the vote of the Other Stockholders only. If a Stockholder neglects to give the notice of Triggering Event required by this Section, the period during which the Corporation may make its election under this Section shall begin to run thirty (30) days after any officer of the Corporation (other than the Stockholder as to which the Triggering Event applies) notifies the Stockholder in writing that the Corporation has received actual notice of the Triggering Event.

B.    Rescission by Corporation After Election.  If the Corporation rescinds its election to purchase the Stock because of the Purchase Price as provided above, then the Corporation shall notify each of the individuals or entities then bound as a Stockholder hereunder (each an "Other Stockholder" and collectively the "Other Stockholders") of its rescission and the Other Stockholders shall have the right to purchase the Stock, or a portion thereof, but not the right to have the Purchase Price redetermined. If this subparagraph B is applicable, then the Other Stockholders shall notify the Divesting Stockholder of their election to purchase the Stock at the Purchase Price determined pursuant to subparagraph A above, within fifteen (15) days immediately following their receipt of notice that the Corporation has rescinded its election under

{J:\CLIENTS\bus\00285\0002\00367167.DOC;2}            - 3 -

subparagraph A above.  If there are two or more of the Other Stockholders electing to purchase the Stock, then each such Other Stockholder shall be offered a pro rata portion of the available Stock.

C.       No Election by Corporation to Purchase.  If the Corporation does not elect to exercise its right to purchase the available Stock within the fifteen (15) day period provided, then the Corporation shall notify each of the Other Stockholders of their right to purchase all or a portion of the Divesting Stockholder's Stock at the Purchase Price determined in accordance with Article V of this Agreement.  Each of the Other Stockholders electing to exercise his, her or its right to purchase the Divesting Stockholder's Stock, must first send a notice in writing to the Divesting Stockholder within the fifteen (15) day period immediately following his or her or its receipt of notification of his or her or its right to purchase.  Such notice shall state the Other Stockholder's election to purchase the Divesting Stockholder's stock, contingent upon his or her or its satisfaction with the Purchase Price.  The Divesting Stockholder and the Other Stockholders electing to purchase will then take all actions necessary to determine the Purchase Price in accordance with Article VII of this Agreement.  After the Purchase Price is so determined, each of the Other Stockholders electing to purchase shall have an additional fifteen (15) day period to rescind his or her or its election and to so notify the Divesting Stockholder in writing.  If there are two or more of the Other Stockholders electing to purchase the Stock, then each such Other Stockholder shall be offered a pro rata portion of the available Stock.

D.       No Election to Purchase.  If neither the Corporation nor the Other Stockholders elect to purchase the available Stock, then the Divesting Stockholder may Transfer such Divesting Stockholder's shares of Stock, within the ninety (90) day period following the expiration of the applicable periods in Sections A through C hereof, provided however, that any shares of Stock so transferred will remain subject to the terms of this Agreement as though Stock hereunder and the transferee(s) shall become a party to this Agreement and bound as though a Stockholder hereunder and further provided that the transfer price and terms shall be at least as favorable to the Divesting Stockholder as those set forth in any notice required under Article VII, Section A.

E.       Involuntary Transfers.  Notwithstanding anything herein to the contrary, if the Triggering Event involves an Involuntary Transfer (as defined below) of any of the Stock owned by a Stockholder, the Corporation and Other Stockholders shall have the same rights with respect thereto as if the Involuntary Transfer had been a proposed voluntary transfer by such Stockholder, except that: (i) the periods within which those rights must be exercised shall run from the date notice of the Involuntary Transfer is received by the Corporation rather than the date in which the Involuntary Transfer occurred, and (ii) the rights shall be exercised by notice to the Involuntary Transferee rather than to the Divesting Stockholder who suffered the Involuntary Transfer.

1.       Delivery of Certificates.  At the closing, the Involuntary Transferee shall deliver certificates representing the Stock being purchased by the purchasing party or parties, duly endorsed for transfer and accompanied by all requisite stock transfer taxes.  The Stock to be

transferred shall be free and clear of any liens, claims, options, charges, encumbrances or rights of others arising through the action or inaction of the Involuntary Transferee, and the Involuntary Transferee shall so represent and warrant, and shall further represent and warrant that he or she is the beneficial owner of the Stock. The purchasing party or parties shall provide payment in the manner set forth in Article VIII. At the closing, both parties to the transaction shall execute whatever additional documents are otherwise appropriate.

2.    Unenforceability of Provisions.  If the provisions of this Article IV.E. shall be held to be unenforceable with respect to any particular Involuntary Transfer of Stock, the Involuntary Transferee shall be bound by this Agreement as if a Stockholder, and the Corporation and Other Stockholders shall have a right of first refusal if the Involuntary Transferee subsequently obtains a bona fide offer for and desires to transfer the Stock, in which event the Involuntary Transferee shall be deemed to be the "Divesting Stockholder" under Article IV.A. and shall be bound by the all other provisions of this Agreement.

3.    Definition of Involuntary Transfer.  For purposes of this Agreement, "Involuntary Transfer" shall mean any transfer, proceeding or action, excluding the death of a Stockholder, by or in which a Stockholder is deprived or divested of any right, title or interest in or to any Stock, including, without limitation, any seizure under levy of attachment or execution, any transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the United States Bankruptcy Code, or any modifications or revisions thereto) or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property, any transfer pursuant to a divorce or separation agreement or a final decree of a court in a divorce action, any transfer occasioned by the incompetence of any Stockholder, or any involuntary transfer to a legal representative of any Stockholder.

## ARTICLE V

## SALES OF SHARES UPON DEATH

A.    Rights and Obligations of the Corporation to Purchase Stock.  Following the death of a Stockholder, the Corporation shall have the right, but not the obligation, to purchase the Stock held by the deceased Stockholder on the date of his death as set forth below; provided that if the Corporation receives within ninety (90) days after the death of the deceased Stockholder notification that it has received or will receive the full death benefit proceeds of the life insurance policy or policies insuring the life of the deceased Stockholder as described in Article IX below (the "Proceeds"), the Corporation shall be obligated to purchase the Stock subject to the following terms of this Article V:

1.    <u>Where Proceeds Received Equal or Exceed Purchase Price</u>. In the event that the Proceeds received or to be received equal or exceed the Purchase Price for the Stock held by the deceased Stockholder, the Corporation shall be obligated to purchase all (but not less than all) of the Stock held by the deceased Stockholder on the date of his or her death, at the Purchase Price determined pursuant to Article VII payable in cash. The Corporation shall pay the deceased Stockholder's estate by the later of (i) fifteen (15) days after the Purchase Price has been finally determined pursuant to Article VII or (ii) two (2) business days after the Corporation receives the Proceeds.

2.    <u>Where Proceeds Received are Less Than Purchase Price</u>. In the event that the Proceeds received or to be received are less than the Purchase Price for the Stock owned by the deceased Stockholder, then (i) the Corporation shall be obligated to purchase, by written notice as set forth below and at a total purchase price equal to the Proceeds, only that number of shares of Stock obtained by multiplying the total number of shares of Stock held by the deceased Stockholder on the date of his or her death by a fraction, the numerator of which is the Proceeds and the denominator of which is the Purchase Price, and (ii) the Other Stockholders shall each have the right, but not the obligation, to purchase all or a portion of the remaining Stock held by the deceased Stockholder not purchased by the Corporation at the Purchase Price per share of Stock calculated in accordance with Article VII. As part of its obligations hereunder, the Corporation shall notify the representative of the deceased Stockholder's estate and each of the Other Stockholders thereof, within five (5) days after the Purchase Price has been finally determined pursuant to Article VII and the Corporation has been notified that it will receive the Proceeds, setting forth the number of shares of Stock which it is obligated to purchase, the amount of the Proceeds, and the Purchase Price. The Corporation shall pay the deceased Stockholder's estate by the later of (i) fifteen (15) days after the date on which the Purchase Price has been finally determined pursuant to Article VII or (ii) two (2) business days after the Corporation in fact receives the Proceeds.

3.    <u>Rights of Stockholders to Purchase Stock</u>. Other Stockholders who have a right to purchase Stock pursuant to Article V.A.2. above shall, within fifteen (15) days after the Corporation has given such notice of its election to purchase less than all of the Stock, give to the representative of the deceased Stockholder's estate and to the Corporation notices of their elections to purchase, indicating the number of shares of available Stock they desire to purchase, the purchase price and the date of payment therefor, which date shall be the date of payment specified in the Corporation's notice of its election to purchase. If the total number of shares of Stock that all other Stockholders desire to purchase exceeds the number of shares of available Stock, each such other Stockholder shall have priority, up to the number of shares of Stock set forth in his or her written election, to purchase that fraction of the available Stock in which the numerator is the number of shares of Stock owned by the purchasing Stockholder and the denominator is the number of shares of Stock owned by all Stockholders who elect to purchase. That portion of the available Stock not purchased on such a priority basis shall be allocated in one or more successive allocations to those Stockholders who have indicated in their written elections that they desire to purchase more than the number of shares of Stock to which they

{J:\CLIENTS\bur\30285Z\0002\00367167.DOC;2}                                - 6 -

have a priority right, with the allocation determined by a fraction, the numerator of which is the number of shares of Stock owned by such purchasing Stockholder and the denominator of which is the number of shares of Stock owned by all such purchasing Stockholders.

4.      Where No Proceeds Received.  In the event that, within ninety (90) days after the death of the deceased Stockholder, the Corporation receives either (i) notification that it will not receive the Proceeds or (ii) no notification whatsoever, the Corporation and the other Stockholders shall have the right to purchase the Stock held by the deceased Stockholder as of the date of his or her death. The rights and obligations of the Corporation, the other Stockholders and the holder of the deceased Stockholder's Stock shall be the same as those specified in Article IV, except that the Corporation shall be considered to have received, on the date on which the Purchase Price has been finally determined pursuant to Article VII, the notice described in Article IV.A. on the 90th day after the death of the deceased Stockholder.

B.      Failure to Purchase Stock.  In the event that the Corporation and/or the Other Stockholders do not purchase all of the shares of Stock of a deceased Stockholder, as provided hereunder, then the estate or beneficiaries of the deceased Stockholder may exercise all remedies available to it or may otherwise transfer such deceased Stockholder's shares of Stock, provided however, that in any event all shares of Stock transferred will remain subject to the terms of this Agreement as though Stock hereunder and the transferee(s) shall become a party to this Agreement and bound as though a Stockholder hereunder.

## ARTICLE VI

## FAILURE TO COOPERATE WITH STOCK TRANSFER

If a Stockholder, or his, her or its executor, administrator, personal representative, successors or permitted assigns, if any, shall become obligated to sell Stock to the Corporation or Other Stockholder hereunder and if such Stockholder shall fail for a period of ten (10) days to deliver such shares in accordance with the terms of this Agreement, the Corporation (assuming that an election to purchase the stock was made by the Corporation hereunder or the Corporation is required to purchase the Stock hereunder), or the Other Stockholders (assuming that such Other Stockholder exercised his or her right to purchase the Stock hereunder), in addition to all other remedies that the Corporation or Other Stockholder may have, shall promptly send to said Stockholder, or his, her or its executor, administrator, personal representative, successors or assigns the Purchase Price for such Stock as herein specified. Thereupon the Corporation shall (a) cancel on its books the certificate(s) representing such Stock and thereupon all of the former Stockholder's rights in and to such Stock shall terminate, in the case of an election or purchase by the Corporation, or (b) register the Other Stockholder as the registered holder of said Stock and cancel on its books the certificate(s) representing such Stock and issue a new certificate representing such Stock to such Other Stockholders, and thereupon all of the former Stockholder's rights in and to such Stock shall terminate.

{J:\CLIENTS\bus\302852000200367167.DOC;2}          - 7 -

## ARTICLE VII

## DETERMINATION OF PURCHASE PRICE

A.  <u>Transfer pursuant to a Buy-Out</u>  If at any time, except during the pendency of a buy-out pursuant to Article IV and Section B hereof, a Stockholder shall decide to sell or otherwise transfer all or a part of his or her Stock, the notice required under Article IV, Sections A through C shall include the name of the proposed transferee and the price and terms upon which such sale or transfer is proposed to be made. In such case, the Purchase Price shall be the lower of the price appearing in the notice adjusted to reflect any differences between the terms stated in the notice and the terms otherwise stated in this Agreement or the amount determined in accordance with Section B of this Article VII.

B.  <u>Purchase Price Defined</u>.  The purchase price to be paid for each share of Stock purchased hereunder (the "Purchase Price") shall be the fair market value of the Stock as of the date of the applicable Triggering Event, as previously determined by the Stockholders pursuant to Article IX. If the most recent fair market value determination was made by the Stockholders more than two (2) years prior to the Triggering Event, then the fair market value of the Stock shall be determined by the agreement of all of the individuals or entities then a party to this Agreement. If the parties are unable to agree, then the fair market value shall be finally determined by the certified public accountant then employed by the Corporation, according to generally accepted accounting principles consistently applied or, if such accountant is unable or unwilling to make such a determination of fair market value, then such final determination shall be made by an independent certified public accountant selected by a simple majority of the parties, according to generally accepted accounting principles consistently applied, provided, however, that if a simple majority of the parties are unable to agree on such an independent certified public accountant then each party shall nominate and pay for a certified public accountant to determine the fair market value of the Stock and the Purchase Price shall be the average value of the values determined by such certified public accountants. If any of the parties to the determination refuses to participate or unreasonably delays the selection of a certified public accountant, then such party shall be deemed to have assented to the selection of an accountant or accountants by the other party or parties. Any life insurance proceeds received by the Corporation upon the death of a Stockholder shall not be included in the determination of fair market value hereunder.

## ARTICLE VIII

## PAYMENT TERMS

Payment of the Purchase Price for any purchase made hereunder shall be made at a Closing at the office of the Corporation on such date as may be mutually agreed upon by the

{J:\CLIENTS\bus\302852\0002\00367167.DOC;2}                       - 8 -

applicable parties, and, except as otherwise provided in this Agreement, the Purchase Price shall be paid as described in this Article VIII no later than ninety (90) days after the end of the fifteen (15) day period within which the Corporation, or if applicable, the Other Stockholders, may rescind its or their election to purchase (the "Closing").

At Closing, the Divesting Stockholder shall transfer, assign and deliver to the purchasing party or parties certificates for the Stock being purchased, free from all liens and encumbrances. The Divesting Stockholder shall indemnify the purchaser or purchasers from and against the claims of any other person with respect to such Stock.

The purchaser or purchasers shall pay the Purchase Price as follows: each purchaser shall pay at least one-tenth of the Purchase Price allocated to such purchaser in cash at the Closing, provided however, that in the event of a purchase by the Corporation following a Divesting Stockholder's death, the cash portion of the Purchase Price delivered at the Closing shall be not less than any life insurance proceeds received by the Corporation upon the death of such Divesting Stockholder. If the entire Purchase Price is not paid in cash in full at the Closing, then the balance of such Purchase Price shall be represented by a promissory note from each purchaser which shall (i) have a principal amount equal to the balance of the Purchase Price allocated to such purchaser, (ii) be dated the date of the Closing, (iii) bear interest from the date thereof on the outstanding unpaid principal at the prime rate from time to time outstanding as published in the Wall Street Journal, plus one (1%) percent, (iv) provide for the payment of the note, both principal and interest, over a seven (7) year period (or such lesser term agreed upon by the purchasing party or parties) payable in consecutive quarterly installments commencing three (3) months after the date of Closing, and (v) give the purchaser the right to prepay the principal thereof in whole or in part at any time without penalty. Any life insurance proceeds due to the Corporation on the life of a Divesting Stockholder that are not received by the Corporation as of the date of the Closing, must be applied by the Corporation towards pre-payment of any note made by the Corporation, if any, upon the Corporation's receipt of such proceeds.

## ARTICLE IX

## INSURANCE

A.    Method of Determination of Fair Market Value. The Stockholders shall by vote of holders of seventy percent (70%) of the issued and outstanding shares of Stock of the Corporation determine the fair market value of the Corporation, which determination shall be made no less than every two (2) years ("Fair Market Value"). The Corporation shall promptly furnish to each Stockholder such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital shares as such Stockholder may reasonably request. Such determination of the Fair Market Value shall be final and binding on the Corporation and the Stockholders for purposes of this Article IX.

B.     Initial Determination; Default Valuation.  The Corporation and the Stockholders acknowledge and agree that the Fair Market Value as of the date of this Agreement is $200,000 . In the event that the Stockholders cannot or do not determine the Fair Market Value within any two (2) year period, then the Fair Market Value shall be determined in the same manner as Article VII.B. above.

C.     Purchase of Insurance.  In order to fund the purchase of the shares of Stock of a deceased Stockholder, the Corporation may obtain life insurance policies on the Stockholders.  The Corporation agrees to pay the premiums on such policies and to keep such policies in full force and effect, and to acquire such additional insurance as the Directors of the Corporation may from time to time approve in their sole discretion such that the total amount of net proceeds payable thereunder shall be one hundred percent (100%) of the most recently determined Fair Market Value.  The Corporation shall continue to be the owner and beneficiary of said policies and all Stockholders hereby consent to the use of the Corporation's assets for these purposes.  The Corporation shall not reduce the Proceeds of any such policies of insurance by borrowings or otherwise without additional insurance coverage to make up for such reduction.  The Corporation shall give proof of its payment of premiums to the Stockholders, and each of them, whenever any one of them shall so request such proof.  If a premium is not paid within twenty (20) days after its due date, the insured shall have the right to pay such premium and be reimbursed therefor by the Corporation.  The Corporation shall have the right to purchase additional life insurance on any or all of the Stockholders and such additional policies shall be likewise subject to this Agreement.  In the event that the Corporation purchases additional life insurance on any Stockholder, each Stockholder hereby agrees to cooperate fully by performing all the re-quirements of the insurer that are necessary conditions precedent to the issuance of such an insurance policy.  Should any Stockholder cease to own any Shares which are subject to being purchased upon his death, such Stockholder shall be entitled to purchase and acquire the life insurance policy or policies maintained by the Corporation on him or her for the cash surrender value thereof.  Upon payment of the appropriate purchase price, the Corporation shall assign such policy or policies to such Stockholder.

## ARTICLE X

## CERTIFICATES

An executed copy of this Agreement shall be maintained by the Secretary of the Corporation with the records of the actions of the Board of Directors of the Corporation.  Each Stockholder shall deliver to the Secretary of the Corporation the certificates for all of the Stock owned by him or her and the Secretary shall endorse, or cause to be endorsed, on the certificates a legend reading substantially as follows:

"Transfer of the securities represented by this certificate is subject to the conditions specified in an agreement between the issuer and its shareholders, made

effective *[as of the date of the Agreement]* and no transfer of the securities represented by this certificate shall be valid or effective until such conditions have been fulfilled. Such agreement may be inspected at the principal executive offices of the issuer. The holder of this certificate, by acceptance thereof, accepts and agrees to be bound by the provisions of such agreement."

During the term of this Agreement a legend reading substantially as above shall be endorsed on each stock certificate hereafter issued by the Corporation to any Stockholder or any transferee whose stock is subject to the terms of this Agreement.

## ARTICLE XI

## EFFECT OF AGREEMENT

The executor, administrator or personal representative of a deceased Stockholder shall execute and deliver any and all documents or legal instruments necessary or desirable to carry out the provisions of this Agreement. This Agreement shall be binding on the Stockholders, their heirs, legal representatives, successors or assigns, and on the Corporation and its successors or assigns.

## ARTICLE XII

## REMEDIES

Each Stockholder hereby acknowledges that a remedy at law for any breach or threatened breach by him or her of the provisions of this Agreement would alone be inadequate, and he or she therefore agrees that the Corporation shall be entitled to injunctive relief in case of any such breach or threatened breach as well as to damages for any injury to the Corporation relating from such breach or threatened breach.

## ARTICLE XIII

## TERMINATION

This Agreement shall terminate upon the earliest to occur of the following events:

    a)     bankruptcy, receivership, or dissolution of the Corporation; or

    b)     if all the shares of Stock come into the ownership of one Stockholder; or

c)     the written agreement of all of the Stockholders and the Corporation to terminate this Agreement.

Upon termination of this Agreement, the Secretary of the Corporation shall, upon tender of a Stockholder's certificates of Stock, delete the legend endorsed thereon pursuant to Article X.

## ARTICLE XIV

## FUTURE STOCKHOLDERS

Any individual or entity which hereafter becomes bound by the terms of this Agreement as a Stockholder hereunder shall insert his, her or its name and address, the date he or she became a Stockholder, and the number of shares of Stock owned by such Stockholder, on Schedule I attached hereto, and such Stockholder shall sign his, her or its name on Schedule I in the presence of a witness to acknowledge his, her or its agreement to be bound as a "Stockholder" hereunder. If such an individual or entity neglects or refuses to sign Schedule I for a period of ten (10) days after a request from the Corporation, the Corporation may enter the name of such individual or entity and other pertinent information on Schedule I and such individual or entity shall be deemed to have appointed the Corporation as its agent for such purpose. If such individual or entity thereafter refuses to sign Schedule I or otherwise abide by this Agreement, the Corporation may treat such refusal as a Triggering Event under Article III and apply the provisions of this Agreement thereto.

## ARTICLE XV

## S CORPORATION STATUS

The Stockholders hereby represent and agree that they will neither take nor permit to be taken any action which will result in the termination of the Corporation's status as a subchapter S corporation, including permitting any entity or individual to become a Stockholder or causing the Corporation to grant disproportional benefits or distributions to Stockholders, if this would result in loss of the Corporation's subchapter S status. In order to maintain the Corporation's status as a subchapter S corporation pursuant to §1362 of the Internal Revenue Code of 1986, as amended, the Corporation agrees that before it issues any shares of its stock to any individual or entity who has not previously agreed to be bound by the provisions of this or a similar stock transfer restriction agreement, the Corporation shall obtain such an agreement from such individual or entity in writing.

## ARTICLE XVI

## BOARD OF DIRECTORS

Until termination of this Agreement, or except as otherwise determined by all of the Stockholders, the Board of Directors shall consist of four (4) members, who shall be the following four individuals:  Timothy J. Wilde, Christian T. Reinhardt IV, Jeremy Hitchcock, and Thomas Daly.  In the event of death of any director, the legal representative of the deceased director's estate shall name a replacement director, who may or may not be a stockholder of the Corporation, which replacement shall be acceptable to and elected by the surviving Stockholders and remaining Directors of the Corporation.  A director shall resign as director immediately upon his resignation from employment with the Corporation or any subsidiary of the Corporation, and immediately upon his termination for cause from the Corporation or any subsidiary of the Corporation.  For any entity whose shares or interests are owned in full or in part by the Corporation, the Corporation shall vote such shares or interests solely upon the direction of a majority of the Directors.

## ARTICLE XVII

### INVENTIONS

Each of the Stockholders hereby assigns, transfers and conveys to the Corporation and its successors and assigns any and all inventions, processes, procedures, systems, discoveries, designs, configurations, technology, works of authorship, trade secrets and improvements (whether or not they are made, conceived or reduced to practice during working hours or using the Corporation's data or facilities) (collectively, "Innovations") which Stockholder makes, conceives, reduces to practice or otherwise acquire during any period, including any period prior to the date hereof, that such Stockholders was a partner, consultant, member, owner, agent, or employee of Dynamic DNS Network Services, LLC (either solely or jointly with others), and which are related to the Corporation's present or planned business, the Corporation's services or products, and any and all patents, copyrights, trademarks, trade names and applications therefor, in the United States and elsewhere, relating thereto.  The Innovations shall be the sole property of the Corporation and shall at all times be held by the Stockholder in a fiduciary capacity for the sole benefit of the Corporation.

All such Innovations that consist of works of authorship capable of protection under copyright laws shall be prepared by the Stockholder as works made for hire, with the understanding that the Corporation shall own all of the exclusive rights to such works of authorship under the United States copyright law and all international copyright conventions and foreign laws.  The foregoing notwithstanding, to the extent that any such Innovation is not deemed a work made for hire, the Stockholder hereby assigns to Corporation such Innovation and any and all patents, copyrights, trademarks, trade names and applications therefore, in the United States and elsewhere, relating thereto.

The Stockholders shall maintain adequate and current written records of all such Innovations, which shall be available to and remain the sole property of the Corporation at all

{J:\CLIENTS\bas\30285\0002\00367167.DOC:2}                      - 13 -

times. The Stockholder shall promptly disclose to the Corporation all such Innovations and shall assist the Corporation in obtaining and enforcing for its own benefit patents and copyright registrations on and in respect of such Innovations in all countries in all ways that the Corporation may request, to secure and enjoy the full benefits and advantages of such Innovations.

## ARTICLE XVIII

## SUPER-MAJORITY VOTE OF STOCKHOLDERS

Except as otherwise set forth herein, any matter that requires the vote of the Stockholders under Delaware law or pursuant to the Certificate of Incorporation of the Corporation and any amendment to the Bylaws of the Corporation shall require approval by persons holding at least sixty-five percent (65%) of shares of common stock of the Corporation.

## ARTICLE XIX

## NOTICES AND AMENDMENT

All notices, offers, acceptances, requests and other communications hereunder shall be in writing and shall be deemed to be duly given if delivered or mailed by certified mail, return receipt requested, addressed to the Corporation or to a Stockholder at the last known address as shown on the records of the Corporation, or to such other address as any party hereto so designates to the other party or parties in writing. This Agreement may be altered or amended only by a writing signed by all of the parties to this Agreement.

## ARTICLE XX

## GOVERNING LAW AND SEVERABILITY

This Agreement shall be governed by the laws of the State of Delaware, notwithstanding the fact that a Stockholder is now or may become a resident or a citizen of a different state. In case any terms of this Agreement or parts thereof shall be held invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other term of this Agreement shall in any way be affected thereby.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as a sealed instrument as of the date first above written.

Attest:                                           DYNAMIC NETWORK SERVICES, INC.

_____              By: _____

Secretary/Asst. Secretary                     Timothy J. Wilde, President

STOCKHOLDERS:

Witnessed by:

_____              _____
                                                     Timothy J. Wilde

Witnessed by:

_____              _____
                                                     Christian T. Reinhardt IV

Witnessed by:

_____              _____
                                                     Jeremy Hitchcock

Witnessed by:

_____              _____
                                                     Thomas Daly

## SCHEDULE I

Ownership of Dynamic Network Services, Inc.

| Name of Stockholder | Address of Stockholder | Number of Shares Owned |
|---|---|---|
| Timothy J. Wilde | 5232 Arbor Drive, Shrewsbury, MA 01545 | 36 |
| Christian T. Reinhardt IV | 1830 East Shore Drive #D2, East Lansing, MI 48823 | 36 |
| Jeremy Hitchcock | 46 Forest Drive, Bedford, NH 03110 | 14 |
| Thomas Daly | 4634 Brown Avenue, Manchester, NH 03103 | 14 |

# DYNAMIC DNS NETWORK SERVICES, LLC

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and entered into as of the 31st day of July, 2003 ("Effective Date"), by and between Dynamic DNS Network Services, LLC ("Company") and Christian T. Renbelt II ("Employee").

WHEREAS, Company desires to retain the services of Employee as ___CTO___ and Employee desires to be employed by Company in such capacity, all upon the terms and subject to the conditions set forth in this Agreement.

NOW THEREFORE in consideration of the recitals and the mutual covenants and undertakings herein, each Party agrees as follows:

1.    Employment and Duties.  Company hereby agrees to employ Employee, and Employee hereby accepts employment, as ___CTO___ of Company upon the terms and conditions hereinafter set forth, both Parties expressly revoking any and all prior employment agreements between them.  Employee hereby agrees to serve Company in such capacity for the period commencing on the Effective Date and continuing for the period stated in Paragraph 3 and upon the terms and conditions herein provided.  As ___CTO___, Employee shall report directly to the ___CEO___ and Employee agrees to perform such duties as may be assigned to him from time to time.  Employee hereby represents and warrants that he is not now subject to any agreement which is or would be inconsistent or in conflict with his obligations hereunder.

2.    Exclusive Services.  Employee agrees that he will, during the employment term, devote his entire working time, attention and best efforts exclusively to the performance of the duties as aforesaid and to the business and interests of Company, and he shall perform such duties as may be assigned to him ably, faithfully and diligently.  Employee shall not at any time or in any manner, either directly or indirectly, be involved in any other occupation while in the employ of Company unless agreed to specifically by Company.  Notwithstanding the foregoing, Employee may devote personal time to his personal affairs and those of his family provided that such activities do not interfere with the performance of his duties hereunder.

3.    Term of Employment.

The period of Employee's employment under this Agreement shall commence as of the Effective Date and terminate one year (1) from the date hereof, unless earlier terminated pursuant to the terms hereof.  This agreement shall renew automatically for additional one-year periods unless either party provides notice to the other within 30 days of such one-year renewal period.

{J:\CLIENTS\bus\302652\0002\00366570.DOC;2}